Cite as 2024 Ark. App. 334

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CR-23-527

| | |
|---|---|
| DEWAYNE CARTWRIGHT<br><br>APPELLANT<br><br><br>V.<br><br><br>STATE OF ARKANSAS<br><br>APPELLEE | Opinion Delivered May 22, 2024<br><br>APPEAL FROM THE PHILLIPS COUNTY CIRCUIT COURT [NO. 54CR-21-152]<br><br><br>HONORABLE CHALK MITCHELL, JUDGE<br><br>AFFIRMED |

**CINDY GRACE THYER, Judge**

Appellant DeWayne Cartwright was convicted of rape by a Phillips County jury and sentenced to forty years in the Arkansas Division of Correction. On appeal, he argues that the circuit court erred in granting the State's motion to unseal a prior conviction; in addition, he challenges the sufficiency of the evidence supporting his conviction. We find no error and affirm.

## I. *Trial Testimony and Evidence*

In March 2021, the seventy-eight-year-old victim in this case was helping her husband and sister-in-law take care of her mother-in-law at Heritage Hill Manor in Helena. As the victim was sleeping in her sister-in-law's apartment, she awoke to see the silhouette of a man standing beside her bed. At first, she thought it was her husband, so she called out his name. The man turned around, and she saw that he was naked and holding a pillow in his hand.

The man put the pillow over her face and pressed down, saying, "I'm going to kill you." The man then let go of the pillow and began choking the victim, so she started trying to push him away and dug her fingernails into his skin. After a few minutes of her scratching at him, he told her that if she would quit fighting, he would stop. When she stopped, the man pulled her nightgown up and penetrated her vagina and anus with his fingers. The man was unable to obtain an erection but nevertheless put his penis in her mouth and pushed it down her throat.

Eventually the man pulled the victim off the bed and told her to go take a shower. After she had been standing in the shower for a few minutes with the water running, the man came back in, pulled the shower curtain back, put his finger between her legs, and said he would like to see her again. He then left the room. The victim waited to make sure the man was gone and then ran across the hall to her mother-in-law's apartment and called the police.

When the police arrived, Officer Roosevelt Eaton obtained a statement from the victim. She was unable to give a description of her attacker or otherwise identify him because it had been dark in the room. Eaton went to the bedroom where the attack had happened and saw a woman's nightgown as well as some pillows with bloodstains on them. Eaton photographed the evidence and collected the nightgown, the pillows, and a bedsheet, placing them in an evidence bag. Evidence Officer Juanita Mills received the bag from Eaton and transported it, along with a rape kit, to the Arkansas State Crime Laboratory.

A forensic serologist at the crime lab identified bloodstains on the nightgown, pillows, and sheet. Cuttings from those materials were sent to the crime lab's DNA section. Emma Fort, a forensic DNA analyst, determined that female DNA from the pillow and bedsheet was consistent with that of the victim. The analyst also found male DNA on the materials and ran it through a database; a "hit" in the database came back as belonging to Cartwright. The crime lab forwarded this information to the Helena-West Helena Police Department, after which Lieutenant Wesley Smith obtained cheek swabs from Cartwright. Smith sent the swabs from Cartwright back to the crime lab, where Fort compared them to the DNA results from her previous testing. She determined that the DNA from the sheet matched Cartwright's DNA, and the chances of the DNA belonging to someone other than Cartwright were 1 in 120 trillion. The chances of the DNA on the pillow belonging to someone other than Cartwright were 1 in 10.5 billion. She therefore concluded that the odds that the blood on the pillow was Cartwright's were "very high," and the blood from the sheet "originated from Dewayne Cartwright with all scientific certainty." She added that she "would not expect to see that profile in anyone else in the population."

At the conclusion of the State's case, Cartwright moved for directed verdict, arguing that the victim had been unable to identify him and that the DNA evidence was insufficient to identify him as the rapist. The court denied Cartwright's motion, and the jury subsequently convicted him of rape.

II. *Sufficiency of the Evidence*

Although Cartwright challenges the sufficiency of the evidence in his second point on appeal, double-jeopardy considerations require us to consider it first. *Chambers v. State*, 2024 Ark. App. 257, ___ S.W.3d ___. In reviewing the sufficiency of the evidence, the court determines whether the verdict is supported by substantial evidence, either direct or circumstantial. *Driver v. State*, 2023 Ark. 181, 678 S.W.3d 753. Substantial evidence is evidence forceful enough to compel a conclusion beyond suspicion or conjecture. *Id.* The evidence is viewed in the light most favorable to the verdict, and only evidence that supports the verdict will be considered. *Id.*

A person commits rape if he or she engages in sexual intercourse or deviate sexual activity with another person by forcible compulsion. Ark. Code Ann. § 5-14-103(a)(1) (Repl. 2013). On appeal, Cartwright argues that the State failed to prove that he was the "person" who committed the alleged act. He notes that the victim was unable to identify him, and none of the police-officer witnesses testified that he was the perpetrator. Cartwright posits that there was no evidence presented in the case that corroborated his identity, noting that he was not seen at or near the crime scene, no items belonging to him were found at or near the crime scene, and there was no testimony that he was ever seen in the vicinity. He concludes, with no citation to convincing authority, that "the only evidence that could support a verdict in this case is the DNA testimony and that should be insufficient."

We disagree. Our appellate courts have "consistently accepted DNA evidence as proof of guilt." *Lewis v. State*, 2010 Ark. 209, at 4; *Ellis v. State*, 364 Ark. 538, 543, 222 S.W.3d 192, 196 (2006). In *Engram v. State*, 341 Ark. 196, 202, 15 S.W.3d 678, 681 (2000), the

4

supreme court held that DNA evidence would have been "substantial standing alone," although it considered that other corroborating evidence had been adduced at trial. Here, the scientific evidence demonstrated that the odds of the DNA evidence taken from the bedsheet belonging to someone other than Cartwright were 1 in 120 *trillion*. *See Terry v. State*, 366 Ark. 441, 444, 236 S.W.3d 495, 498 (2006) (when the probability of selecting another person with the same DNA profile as appellant's was more than one in one trillion, substantial evidence supported appellant's conviction for rape).[1] We therefore hold that substantial evidence supports Cartwright's rape conviction.

### III. *Unsealed Conviction*

In what is actually his first point on appeal, Cartwright argues that the court erred in granting the State's pretrial motion to unseal a previous conviction. The day before Cartwright's jury trial began, the State asked the court to unseal "a 2001 previous sex conviction" so that it could examine the file in order to determine whether anything in it could be used for impeachment purposes or possibly to charge Cartwright as a habitual offender. Over Cartwright's objection, the court ordered the record unsealed pursuant to Arkansas Code Annotated section 16-90-1417 (Supp. 2023).

---

[1]We also note that the DNA results do not stand in a vacuum. The DNA was obtained from a bloodstain on the sheet and pillowcases. The victim testified that she scratched her attacker and dug her fingernails into his skin and "must have hurt him a little bit" in doing so. The victim's actions in scratching Cartwright account for the presence of his blood on the bed linens.

On appeal, Cartwright argues that the court erred in unsealing the conviction. He cites Arkansas Code Annotated section 16-90-1416(a)(3)(A)–(B) (Supp. 2023), which provides that the custodian of a sealed record shall not disclose the existence of or release a sealed record except when requested by a court upon a subsequent adjudication of guilt of the person whose record has been sealed or another good reason shown to be in the interests of justice. He urges that because the motion was made prior to trial, there had not yet been a "subsequent adjudication of guilt"; therefore, the court could not properly have relied on this statute to unseal his record.

This argument is misplaced, however, because the circuit court did not rely on section 16-90-1416 to unseal Cartwright's record. Instead, the court cited section 16-90-1417(b), which provides in pertinent part as follows:

> (b)(1) Upon the entry of the uniform order, the person's underlying conduct shall be deemed as a matter of law never to have occurred, and the person may state that the underlying conduct did not occur and that a record of the person that was sealed does not exist.
>
> (2) This subchapter does not prevent the use of the record of a prior conviction otherwise sealed under this subchapter for the following purposes:
>
> (A) A criminal proceeding for any purpose not otherwise prohibited by law;
>
> (B) Determination of offender status under the former § 5-64-413;
>
> (C) Habitual offender status, § 5-4-501 et seq.;
>
> (D) Impeachment upon cross-examination as dictated by the Arkansas Rules of Evidence[.]

6

Regardless of the subsection under which the circuit court ordered the record unsealed, however, Cartwright cannot demonstrate prejudice from the court's decision to grant the State's motion. The trial transcript and the record pleadings do not reflect that the 2001 conviction was ever introduced into evidence or otherwise mentioned during the trial. Likewise, the record shows that the State did not seek to amend the criminal information to charge Cartwright as a habitual offender.

Moreover, although Cartwright argues--briefly and without citation to authority-- that the court's decision was prejudicial to him "because it meant he could no longer take the stand in his own defense without the prior convictions being used for impeachment," Cartwright failed to proffer the substance of what his testimony would have been. In *Smith v. State*, 300 Ark. 330, 336, 778 S.W.3d 947, 950 (1989), our supreme court held that in order

> [t]o perform the weighing of [a] prior conviction's probative value against its prejudicial effect, as required by Rule 609(a)(1), the reviewing court must know the precise nature of the defendant's testimony, which is unknowable when, as here, the defendant does not testify. Any possible harm flowing from a trial court's in limine ruling permitting impeachment by a prior conviction is wholly speculative. Moreover, when the defendant does not testify, the reviewing court has no way of knowing whether the State would have sought so to impeach, and cannot assume that the trial court's adverse ruling motivated the defendant's decision not to testify.

As such, the *Smith* court adopted the rule announced in *Luce v. United States*, 469 U.S. 38 (1984), which states that in order to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify. *Id.*

Because Cartwright neither testified nor proffered the substance of what his testimony might have been if he had chosen to do so, we have no way of effectively judging whether he was prejudiced by the court's decision to unseal his prior conviction. Accordingly, because we will not reverse in the absence of a demonstration of prejudice, *see Campbell v. State*, 2017 Ark. App. 59, 512 S.W.3d 663, we affirm on this point.

Affirmed.

BARRETT and BROWN, JJ., agree.

*Don R. Etherly*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Jacob H. Jones*, Ass't Att'y Gen., for appellee.